KYNES v. ADAMS, Secretary of State, et al.
No. 19575.
Circuit Court, Leon County.
July 24, 1964.

66

Hall, Hartwell & Hall, Tallahassee, for plaintiff.

William J. Roberts, Tallahassee, for Secretary of State and Board of State Canvassers.

Julius F. Parker of Parker, Foster & Madigan, Tallahassee, Murray Sams, Jr. of Sams, Anderson, Alper & Spencer, Miami, and Hayward V. Atkinson, Tallahassee, for Earl Faircloth.

Wayne M. Carlisle, Gainesville, for Board of County Canvassers of Alachua County.

Richard J. Wilson, Gainesville, for Supervisor of Registration of Alachua County.

G. C. Perdue, Jr., Bronson, for Board of County Canvassers and Supervisor of Registration of Levy County.

Darrey A. Davis, County Attorney, Dade County, for Board of County Canvassers and Supervisor of Registration of Dade County.

HUGH M. TAYLOR, Circuit Judge.

*Order on pre-trial conference*: This is an election contest filed pursuant to provisions of section 99.192, Florida Statutes.

When the board of state canvassers canvassed election returns from the several counties of the state to determine the results of the primary election held May 5, 1964, it ascertained and announced that for nomination as the candidate of the Democratic Party for the office of Attorney General of Florida, Earl Faircloth had received 469,638 votes, and that James W. Kynes had received 469,039 votes, and declared Faircloth the nominee of the Democratic Party for that office. This contest resulted.

The complaint alleges certain irregularities in the conduct of the election in Dade County, but the plaintiff has announced before the court that he does not contend that these irregularities are of such nature as to justify changing the result of the election. Therefore, these allegations will be hereafter taken as abandoned.

It is also alleged that certain illegalities occurred in relation to the absentee ballots cast in Levy County. The number of such ballots, and the plurality of Faircloth resulting from counting them are less than Faircloth's plurality in the state and, therefore, unless illegalities elsewhere require the disregard in ascertaining the result of the election of other ballots, the illegalities, if any, in Levy County cannot change the result of the election and, therefore, should not be considered.

The primary contentions of the plaintiff revolve around the ballots cast in Alachua County. As a result of a series of pre-trial conferences in which counsel for all parties have evidenced a laudable desire to simplify the issues and assist in the early determination of this case, the interested candidates have agreed upon the following statement of facts, admissions and points of disagreement with regard to the conduct of the election in Alachua County —

> In the conduct of the primary election of May 5, 1964, the registration books of Alachua County containing the registrations or purported registrations of the qualified electors of said county were used.
>
> The gravamen of the plaintiff's case is the assertion that persons illegally registered and, therefore, not entitled to vote were permitted to vote in the election in Alachua County in numbers exceeding the margin by which defendant Earl Faircloth defeated plaintiff, James W. Kynes, in said election.
>
> The irregularities complained of consist of the following —
>
> (A)  With regard to none of the registrations in Alachua County was the seal of the supervisor of registration placed upon the affidavit of the registrant.
>
> (B) (1)  As a result of a move among various civic organizations to increase the registration in Alachua County, the supervisor of registration appointed a large number of deputy supervisors of registration.
>
> (2)  At least some of these deputy supervisors of registration attempted to exercise the power of appointment and appoint other deputies. In doing so, the deputies so appointed were instructed to go to the supervisor of registration and be sworn in. Many of them did so.
>
> (3)  There were some deputy supervisors who accepted registrations and took the oath shown on exhibit 3, but the number of such registrants is not admitted.
>
> (4)  It is possible that some of these deputies appointed by deputies did not appear and take an oath before the supervisor of registration, but actually registered voters. (This is an issue of fact.)
>
> (5)  The supervisor of registration distributed large numbers of the appropriate blanks to the deputy supervisors so appointed and they went into public places, such as supermarkets, and they also went from house to house and solicited and accepted registrations from qualified electors.

(6)   The registrations were received by the following mechanics —

(a)   The deputy would secure the required information from elector and fill in, in longhand, the blanks on a registration certificate, a form of which is attached marked exhibit 1, and then would require of the registrant that he sign the oath appearing on a registration form, copy of which is attached as exhibit 2. The blanks in exhibit 2, except for the signature of the registrant, were not filled in at that time.

(b)   The deputies taking the registrations either personally or through others returned the registration certificate and signed registration form above mentioned to the office of the supervisor of registration. In the office of the supervisor of registration a duly appointed deputy filled in with typewriter the blanks in the registration form from the data appearing in longhand on the registration certificate.

(c)   In those registrations by deputies outside the supervisor's office, with the exception of an immaterial number, there was no signature of a deputy attesting the signature of the registrant on the registration form.

(d)   All deputies were definitely instructed to require an oath and to impress upon the registrant the fact that he was under oath when signing the registration form.

(e)   The deputies who accepted the registrations in the manner last described did so without regard to the hours of registration specified in any statute and may have accepted registrations on Sunday.

(7)   The number of registrations accepted after hours and on Sunday is in dispute.

(8)   There is no proof or allegation that any registrations were accepted after the proper time for the closing of the books before the election.

(C) (1)   It is admitted that there was no seal of the supervisor of registration on any registration affidavit.

(2)   It is not admitted that there were enough registrants registered by deputies outside of the supervisor's office with regard to whose affidavit of registration there was no attesting officer to change the result of the election.

(3)   It is admitted that there were some electors registered by deputies who were not duly sworn in by the supervisor (and some deputies may have accepted registrations before being sworn in by the supervisor), but it is not admitted that these registrations were in numbers sufficient to change the result of the election.

(4)   It is not admitted that there were enough registrants registered after hours or on Sundays to change the result of the election.

(D)   The term registrant shall only apply to registrants who voted in the May 5, 1964, primary.

(E)   If the matters not admitted become necessary of adjudication, testimony will have to be taken on those issues.

(F)   It is not contended in the case that any person was registered who was not a qualified elector of Alachua County and entitled to register.

(G)   It is not contended that with regard to any registrant the signature on the registration form is not the true signature of the registrant.

(H)   It is not contended that any person voted in the election who did not possess the legal qualifications to have registered and voted in the election.

(I)   There is no charge of actual fraud, corruption or dishonesty in the registration of electors or conduct of election.

(J)   There was no challenge of any voter at the polls, and no protest of any irregularity made to the county canvassing board prior to canvass of the returns.[1]

In addition to discussion of the facts as set forth in the foregoing stipulation, counsel for the respective parties have argued the law of the case and have filed briefs with the court.

The defendant[2] first insists that the plaintiff, Kynes, is estopped to assert any irregularity or illegality in the ballots cast by the persons who are alleged not to have been lawfully registered because of an official opinion rendered by him as Attorney General before the election, in which he expressed the view that, from the facts then put before him, the irregularities in the registration of voters in Alachua County were not sufficient to declare the registrations illegal. It is not alleged, and there was at pre-trial no offer of proof, that his opinion was communicated to or relied upon by the voters who cast the ballots now in question or the precinct election officials who received and counted these ballots.

Under such circumstances the basic elements of an estoppel are lacking and this contention of the defendant must fail.

The defendant next contends that the contest should be dismissed because it is founded upon a misconception of the law with respect to the treatment to be accorded the returns from precincts or counties in which illegal ballots have been cast and included in the count of votes.

The plaintiff's theory is that if it be established that a number of illegal ballots greater than the successful candidate's plurality were cast in certain precincts, and so co-mingled with the other ballots in such precincts that they cannot be identified, then the entire returns from such precincts should be disregarded in determining the result of the election.

On the other hand, the defendant argues that the presence of illegal ballots in any precinct should not require the rejection of all the ballots cast in the precinct but should result only in a pro

---

[1] It was also admitted that Alachua County has adopted the permanent registration system.

[2] Wherever the singular word "defendant" is used it refers to the contestee, Earl Faircloth.

rata reduction of the vote for each candidate as reflected in the returns from such precinct.

The plaintiff does not allege or contend that a pro rata reduction of the votes cast in the precincts in which the alleged illegal ballots were cast would change the result of the election. It, therefore, follows that if the plaintiff is wrong and the defendant is right as to the proper method of treating illegal ballots this case must be decided in favor of the defendant without further ado.

The problem of dealing with a situation in which illegal but unidentifiable ballots have been co-mingled with valid ballots in the conduct of an election has plagued the courts for many years. Four quite different solutions have been offered, each of which has found support in sound reasoning, but each of which has been severely criticized. They are[3] — (1) The election may be declared invalid; (2) the vote of the precinct wherein the illegal voting occurred may be rejected; (3) there may be a pro rata deduction of the illegal votes according to the number of votes cast for the respective candidates in the election district; or (4) the illegality may be entirely ignored.

This court is spared the necessity of weighing the relative merits of the reasoning supporting these various conclusions by the fact that the Supreme Court of Florida has very definitely aligned this state with those who adopt the second view.[4]

It follows that if the plaintiff can establish that illegal ballots were cast in specified precincts in numbers greater than the margin by which the defendant defeated the plaintiff and that by an elimination of those precincts from the total vote of the state the result would be that the plaintiff obtained a majority of the ballots then counted, it would be the duty of the court to declare the plaintiff to be the nominee of the Democratic Party for the office of Attorney General of Florida.

An election contest presents to the court not only the problem of deciding the personal and individual rights of aspirants to public office, but it also involves dealing with the rights of many voters[5] who have cast their ballots for one or the other of the candidates. It also involves the preservation of popular government. Too strict a construction of the statutes or too rigid ap-

---

[3]See discussion in annotation 155 ALR 677 (678).

[4]Parra v. Harvey, 89 So.2d 870.
 Griffin v. Konth, 67 So.2d 431.
 Rinehart v. State, 200 So. 218.
 State v. Rinehart, 192 So. 819.

[5]In this discussion the word "voter" shall refer to a citizen actually casting a ballot. The words "qualified elector" shall mean a person having all of the legal qualifications to entitle him to register to vote.

plication of court-made rules to the conduct of elections resulting in the throwing out of ballots from many precincts can thwart the popular will and defeat the purpose of the whole election process. On the other hand, too lax an approach to the problem opens the door to fraud and corruption which are equally destructive of popular government.

The stipulated facts narrow the issues in the case to a point where the applicable law can now be stated with particularity.

The failure of the supervisor of registration to affix her seal to each registration, or require her deputies to do so, is an irregularity of little importance. The applicable statute, section 98.341, is expressly directory. Certainly the failure of a public officer to perform such a ministerial duty should not be held to disfranchise all the qualified electors in a populous county and render an election in this county impossible until a re-registration can be affected.

In determining the validity of the ballots cast by persons alleged to have been improperly registered for other reasons, it is necessary to construe section 98.281, Florida Statutes, which provides — "Each supervisor may appoint deputy supervisors to accept registration of those who are qualified in settled sections of the county as may be reasonably necessary. These appointments are in addition to precinct registration officers, who shall accept registration during the time provided in section 98.021."

Another statute[6] in existence prior to the amendment of this section authorized supervisors of registration to appoint deputies who "shall have the same powers and whose acts shall be as effective as the acts of the supervisor" and also to appoint precinct registration officers for each precinct.

The court is of the opinion that the deputy supervisors authorized by section 98.281 are in addition to the deputies authorized by other statutes and their appointment is for the purpose of facilitating the registration of voters in areas of dense population. It will be observed that sections 98.011, 98.021 and 98.051 provide rather rigid schedules of days and hours during which the registration books shall be open in the county office of the supervisor of registration and in the several precinct offices. The plaintiff contends that the deputies appointed under section 98.281 are bound by these limitations. It is the duty of the court to construe all the sections of the statute in pari materia and in such manner as to give each section a reasonable field of operation if the language used by the legislature is susceptible to such a construction.

---

[6]Section 98.271, Florida Statutes.

The court is of the opinion that when section 98.281 is construed in pari materia with the other cited sections a practical and workable system of registration is authorized which may be described as follows — During specified hours and days when the books are open, registration of voters may be accepted in the office of the supervisor of registration in the county seat. During a stated schedule of hours and days the precinct registration officers are authorized to accept registration in the precinct registration offices which have been located and notice of their location published as provided by the statutes. In "settled" sections additional deputies may accept registration of voters without being subject to the limitation of hours, days of the week or location at which the registrations are accepted pursuant to sections 98.011, 98.021, or 98.051. But no registration may be taken by anyone after the time fixed by subsection 98.051(3) for the closing of the books before an election.

This means of registering electors in settled areas is obviously a broad departure from previously accepted practices, but that does not render the statute invalid or authorize the court to place a construction upon it that would destroy an apparent legislative intent. It is possible that one reason for the adoption of this statute and the relaxation of the rigid rules as to time and place of registration of voters is that under the law prior to adoption of the permanent registration system it was required that electors when registering should sign in a large book containing the signatures and information relating to great numbers of other electors. These books were susceptible to being lost, destroyed or defaced so that rigid rules for their preservation were practical necessities. However, under the permanent registration system it is not necessary for the elector to sign, and he does not sign, in the book itself. Instead he signs a form to be inserted in the book. Loss of a small number of these forms would be far less disruptive of the election process than loss of one of the old fashioned books containing many registrations. Also, since the books were limited in number, their location at all times was a matter of necessary public information so that at any time when the books were open any person desiring to register would know where he could find the books so that he could register.

Whether this be the reason or not, the court is of the opinion that the supervisor of registration of Alachua County was authorized by the statute to appoint deputy supervisors with authority to accept registration of electors in any location within settled sections of that county and that reasonable discretion was vested in the supervisor with respect to the number of such deputies and the sections in which they should be appointed.

Section 98.281 does not specifically require that deputies appointed pursuant to its provisions take an oath. However, the court is of the opinion that the nature of the duties of such deputies is such that they should be required to take an oath before accepting registrations.

The plaintiff suggests that the second sentence of section 98.281 — "These appointments are in addition to precinct registration officers, who shall accept registration during the time provided in section 98.021" — constitutes a limitation upon the times and particularly the hours of the day and days of the week in which registrations may be accepted and that deputies appointed pursuant to this section are bound in those respects by sections 98.021 and 98.051 (2). This construction would violate the ordinary rules of grammar and would for all practical purposes limit the activities of these deputies to the activities of precinct registration officers and would almost completely eliminate section 98.281 from the statutes.

It follows from what has been said that the court finds that the registrations of voters by deputy supervisors duly appointed pursuant to section 98.281 and duly sworn may lawfully be accepted at any points within those sections of the county determined by the supervisor to be settled sections and registrations so taken are valid.[6a]

With respect to the registration of voters by purported deputy supervisors not appointed by the supervisor and not sworn by the supervisor but appointed and sworn by other deputies, or not actually sworn, and not lawfully entitled to accept registration of electors. The defendant argues that the broad language of section 98.271 quoted above is sufficient to authorize deputy supervisors to appoint deputies. The court cannot agree. McKinnon v. McCollum, 6 Fla. 376. However, since it appears that all persons accepting registrations acted in good faith were clothed with apparent authority by the possession of registrations forms and registration certificate forms issued by the supervisor of registration, the qualified electors applying for registration to such officers and in good faith attempting to register before such officers should not be deprived of their franchise because of defects in the technical qualifications of such deputies. The court is of the opinion that these purported deputies should be regarded as de facto deputies even though the court be constrained to hold that they were not de jure officers.

---

[6a]What is here stated is in relation to the validity of appointments as affecting the official acts of the deputies. It would not necessarily be controlling in direct proceedings to determine if particular appointments were an abuse of the statutory power of the supervisor to appoint such deputies "as may be reasonably necessary."

The Supreme Court of Florida held as far back as 1886 that it was too well settled to require the collection of authority that the failure of inspectors of an election to be sworn would not invalidate the election.[7] An oath of the inspectors actually conducting an election and counting the ballots would seem to be just as vital as the oath of a deputy supervisor of registration who registers a part of those voters.

The courts of Florida are committed to the proposition that an elector should not be disfranchised because of the failure or neglect of the supervisor of registration to perform his proper duties and functions.

Supervisors of registration are not, nor are their deputies, required or expected to be lawyers. While it is, of course, the duty of every person assuming to perform the duties of such a public office to acquaint himself with and to follow the law applicable to his official duties, it does not follow that every honest mistake or exercise of poor judgment renders his official acts void and deprives the citizen who has relied upon them of his right of franchise.

Some of the proceedings under the purported authority of section 98.281 which the supervisor of registration admits having followed are of doubtful propriety when viewed from a technical legal standpoint. The court cannot say, however, that the supervisor exceeded the scope of administrative discretion in the number of deputies appointed and the laxity of supervision of their operations to such extent as to render her acts illegal. If the irregularities *charged* but not admitted actually occurred, there was a definite failure on the part of the supervisor to properly perform the duties of her office, but when the acts charged are accepted as facts they do not make a showing sufficient to justify discarding the ballots of qualified electors because of defective registration and, with them, the ballots of even larger numbers of admittedly legal voters and thus effecting a change in the result of a popular election in no way tainted by fraud, corruption or coercion.

The Supreme Court of Florida has said that — "Republics regard the elective franchise as sacred, and the court should not set aside an election because some official has not complied with the law governing elections where the voter has done all in his power to cast his ballot honestly and intelligently, unless fraud has been perpetrated or corruption or coercion practiced to a degree to have affected the result."[8]

---

[7] State v. Baker County, 22 Fla. 29.

[8] Carn v. Moore, 76 So. 337.

And that court has held that "all statutes tending to limit the citizen in the exercise of the right to vote should be liberally construed in his favor."[9] And also that "informalities or irregularities which do not affect the result of an election, will not render it invalid."[10]

While the litigants before this court are primarily Messrs. Kynes and Faircloth, their interests are not greater than those of the citizens who are charged with stuffing the ballot boxes of Alachua County with illegal ballots. These citizens had subscribed the constitutional oath before persons purporting to act as deputy supervisors, and who were possessed of that which the average citizen would regard as the best evidence of authority — the official forms and blanks used in accepting registrations of electors. The supervisor of registration had placed the stamp of approval upon the acts of her purported deputies by receiving the registrations and placing them in the proper registration books.

The next question presented involves the mechanical processes employed in effecting the registration of electors. These proceedings were not conducted in the way in which they should have been. The statute contemplates an affidavit of the registrant.[11] The term "affidavit" implies not only the signing of a written oath by the registrant but the attestation of the registrant's signature by an officer.[12] That was not done in many cases. But here again the default was that of the person assuming to accept the registration. It was not the fault of the elector.

Under these circumstances, the court is of the opinion that each of the electors registered in the manner described in the stipulation was justified in assuming that he was properly registered and entitled to vote and in the absence of any allegation of fraud, dishonesty or deceit and in the absence of any allegation or proof that any person who actually voted in the election was not a qualified elector under the law and authorized to register and vote, the court is constrained to hold that there is no showing of such irregularity as to render the ballots void.

In this connection it is significant to note that the constitution does not require that the registrant make an affidavit. It requires that he "subscribe" an oath. In each instance here involved the registrant did in fact subscribe to a written oath. He thus met the constitutional requirements.[13]

---

[9]State v. Saxon, 12 So. 218 (224).

[10]Willets v. North Bay Village, 60 So.2d 922.

[11]Section 98.111, Florida Statutes, 1963.

[12]See Words and Phrases, Vol. 2A, pages 324-339.

[13]Constitution of Florida, Article VI, Section 3.

It is also of interest to observe that the defects in the registrations procedure relied upon by the contestant in this case would appear to be insufficient to make the electors ineligible or the ballots illegal when viewed in the light of section 101.111 which prescribes the procedure to be followed if the right of a person to vote is challenged. This section requires in such instances that the person applying to vote make an affidavit which, so far as pertinent here, is in these words — "That I personally made application for registration and signed my name and that I am a qualified elector." Each of the persons whose vote is called into question is admitted to have been a qualified elector. Each of them signed their names to the constitutional oath. And each of them applied to a person apparently having authority to accept registrations (and whose registration of the elector was recognized and accepted by the supervisor by placing the name of that person in the registration book).

The conclusions here reached are fortified by the opinion of my brother, Patten, rendered in case no. 11917 in the circuit court of Alachua County.

It necessarily follows that the controverted facts are immaterial in a determination of the rights of the parties, and there is no necessity for the taking of testimony.

Counsel will prepare an appropriate decree.